**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Vickie White,

               Plaintiff,

v.

Carolyn W. Colvin,

               Defendant.

No. CV-15-08169-PCT-JZB

**ORDER**

      Plaintiff Vickie White seeks review of the Social Security Administration Commissioner's decision denying her social security benefits under the Social Security Act.  (Doc. 1; Doc. 22.)  For reasons below, the Court will affirm the Commissioner's decision.

## I.   Background

      On August 24, 2009, Plaintiff filed an application for supplemental security income benefits under Title XVI of the Social Security Act.  (AR[1] 245-48.)  Plaintiff asserts disability beginning on October 27, 1982.  (*Id* at 245.)  Plaintiff's application was initially denied on December 18, 2009, and upon reconsideration on July 22, 2010.  (*Id* at 132-35, 140-43.)  Plaintiff requested a hearing, and a hearing was held on February 28, 2012.  (*Id.* at 110.)  In a decision dated March 13, 2012, Administrative Law Judge Patricia A. Bucci (ALJ) denied Plaintiff's request for benefits.  (*Id.* at 121.)

      On July 19, 2013, after review, the Appeals Council vacated the ALJ's decision

---

[1] Citations to "AR" are to the administrative record.

and sent the matter back to the ALJ for additional proceedings.  (*Id.* at 127-30.)  The Appeals Council found the following deficiencies in the ALJ's decision:

1. It contained "no assessment of whether obstructive sleep apnea, major depression with psychosis, and rheumatoid arthritis constitute severe impairments, although these have all been diagnosed by treating sources during the period at issue";

2. "The record is unclear about whether [Plaintiff] is illiterate";

3. "As [Plaintiff] is limited to routine and repetitive tasks and occasional interaction with the public, vocational expert testimony should be obtained to determine how [Plaintiff's] mental limitations erode the unskilled occupational base; and

4. "[W]hile [Plaintiff's] non-exertional physical limitations considered singly may not have a significant impact on the availability of unskilled light work, the hearing decision contains no consideration of how the combination of [Plaintiff's] non-exertional limitations may reduce the unskilled light occupational base."

(*Id.* at 128-29.)

The Appeals Council instructed the ALJ to do the following on remand:

1. "Obtain additional evidence concerning [Plaintiff's] impairments in order to complete the administrative record," which, "if warranted and available," may include, "consultative physical and psychological examinations and medical source statement[s] about what [Plaintiff] can still do despite the impairments," and the ALJ should "attempt to resolve the issue of whether Plaintiff is illiterate";

2. [I]f necessary, obtain evidence from a medical expert to clarify the nature and severity of Plaintiff's impairments";

3. "Further evaluate [Plaintiff's] mental impairments in accordance with the special technique described in 20 CFR 416.920a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described";

4. "Give further consideration to [Plaintiff's] maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations . .

. In doing so, evaluate the treating and nontreating source opinions pursuant to the provisions of 20 CFR 416.927 and Social Security Rulings 96-2p and 96-5p, and nonexamining source opinions in accordance with the provisions of 20 CFR 416.927(e) and Social Security Ruling 96-6p, and explain the weight given to such opinion evidence. As appropriate, the Administrative Law Judge may request the treating and nontreating sources to provide additional evidence and/or further clarification of the opinions (20 CFR 416.912)"; and

5. "If warranted by the expanded record, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on [Plaintiff's] occupational base. . . . Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p)."

(*Id.* at 129-30.)

The ALJ held a second hearing on January 8, 2014. (*Id.* at 65-88.) In a February 19, 2014 decision, the ALJ found Plaintiff is not disabled and not entitled to benefits. (*Id.* at 12-28.) On July 31, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner of Social Security. (*Id.* at 1-6.)

Having exhausted the administrative review process, on September 9, 2015, Plaintiff sought judicial review of the ALJ's decision by filing a Complaint in this Court pursuant to 42 U.S.C. § 405(g). (Doc. 1.) On February 16, 2016, Plaintiff filed an Opening Brief, seeking remand of this case to the Social Security Administration for an award of benefits. (Doc. 22.) On April 14, 2016, Defendant filed a Response Brief in support of the Commissioner's decision. (Doc. 27.) On April 29, 2016, Plaintiff filed a Reply Brief. (Doc. 28.)

## II.   Legal Standards

### a.  Standard of Review

- 3 -

The Social Security Act, 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's disability benefits determinations. The Court may set aside the Commissioner's disability determination only if the determination is not supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); *Marcia v. Sullivan*, 900 F.2d 172, 174 (9th Cir. 1990). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007); *see also Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998).

In determining whether substantial evidence supports the ALJ's decision, the Court considers the record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusions. *Reddick*, 157 F.3d at 720; *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993). The ALJ is responsible for resolving conflicts, ambiguity, and determining credibility. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). The Court "must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F.3d at 1039. "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Orn*, 495 F.3d at 630 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). The Court reviews only those issues raised by the party challenging the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). Similarly, the Court reviews "only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

### b. The ALJ's Five-Step Evaluation Process

To be eligible for Social Security benefits, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

1  lasted or can be expected to last for a continuous period of not less than 12 months." 42

2  U.S.C. § 423(d)(1)(A); *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  A

3  person is under a disability only:

> if his physical or mental impairment or impairments are of
> such severity that he is not only unable to do his previous
> work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful
> work which exists in the national economy.

7  42 U.S.C. § 423(d)(2)(A).

8     The ALJ follows a five-step evaluation process to determine whether an applicant

9  is disabled under the Social Security Act:

> The five-step process for disability determinations begins, at
> the first and second steps, by asking whether a claimant is
> engaged in "substantial gainful activity" and considering the
> severity of the claimant's impairments. *See* 20 C.F.R. §
> 416.920(a)(4)(i)-(ii). If the inquiry continues beyond the
> second step, the third step asks whether the claimant's
> impairment or combination of impairments meets or equals a
> listing under 20 C.F.R. pt. 404, subpt. P, app. 1 and meets the
> duration requirement. *See id.* § 416.920(a)(4)(iii). If so, the
> claimant is considered disabled and benefits are awarded,
> ending the inquiry. *See id.* If the process continues beyond
> the third step, the fourth and fifth steps consider the
> claimant's "residual functional capacity" in determining
> whether the claimant can still do past relevant work or make
> an adjustment to other work. *See id.* § 416.920(a)(4)(iv)-(v).

18  *Kennedy v. Colvin*, 738 F.3d 1172, 1175 (9th Cir. 2013).  "The burden of proof is on the

19  claimant at steps one through four, but shifts to the Commissioner at step five." *Bray v.*

20  *Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).

21     Applying the five-step evaluation process, the ALJ found that Plaintiff is not

22  disabled and is not entitled to benefits.  (AR 28.) At step one, the ALJ found that Plaintiff

23  had not engaged in substantial gainful activity since August 24, 2009.  (*Id.* at 14.)  At step

24  two, the ALJ found that Plaintiff has the following severe impairments: lumbar

25  degenerative disc disease with disc protrusion, asthma, chronic headaches, post-traumatic

26  stress disorder (PTSD), major depressive disorder with history of psychosis, obesity,

27  borderline intellectual functioning, and drug and alcohol abuse (DAA) in remission.  (*Id.*)

28  At step three, the ALJ found that Plaintiff does not have an impairment or combination of

impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.* at 15.)

At step four, the ALJ found the following:

> [Plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except [Plaintiff] is able to frequently crawl, kneel, crouch, and climb ramps and stairs, as well as occasionally climb ladders, ropes, and scaffolds. [Plaintiff] should avoid concentrated exposure to pulmonary irritants, poorly ventilated areas, dangerous with moving mechanical parts except for vehicles, and unprotected heights that are high or exposed. [Plaintiff] is also able to perform work that is simple, routine, and repetitive, which can also be learned through demonstration within 30 days and performed in environments that require only occasional changes in the work setting. [Plaintiff] is also able to perform work that involves occasional interaction with the public, co-workers, and supervisors, but can still be in the vicinity of others. [Plaintiff] should not use cash registers or be required to read as a primary job duty.

(*Id.* at 19-20.)  At step five, the ALJ found Plaintiff has no past relevant work, is a younger individual, "has a limited education and is able to communicate in English," and "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform."  (*Id*. at 27.)  Finally, the ALJ concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, since August 24, 2009, the date the application was filed."  (*Id.* at 28.)

## III.   Analysis

Plaintiff alleges that the ALJ committed numerous errors and her decision is not supported by substantial evidence.  Specifically, Plaintiff asserts that: (1) the ALJ erred in her treatment of Plaintiff's symptom testimony; and (2) the ALJ failed to comply with the Appeals Council's remand order by (a) failing to consider Plaintiff's educational records and failing to find that Plaintiff is illiterate, (b) failing to properly consider Plaintiff's severe mental impairments, (c) improperly weighing all treating and non-treating medical sources, (d) failing to consider Plaintiff's severe rheumatoid arthritis (RA) and sleep apnea, (e) failing to obtain additional evidence, including medical evidence, and (f) failing to reconcile a conflict between Plaintiff's illiteracy and the occupations the

Vocational Expert (VE) testified Plaintiff can perform.  (Doc. 22 at 6-24.)  Below, the Court addresses Plaintiff's arguments.

### a.  Plaintiff's Symptom Testimony

### i.  Legal Standards

Plaintiff argues that the ALJ erred in evaluating Plaintiff's symptom testimony. (Doc. 22 at 21-24.)   An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *Garrison*, 759 F.3d at 1014-15 (citing *Lingenfelter*, 504 F.3d at 1035-36).   "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Lingenfelter*, 504 F.3d at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  The claimant is not required to show objective medical evidence of the pain itself or of a causal relationship between the impairment and the symptom.  *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). Instead, the claimant must only show that an objectively verifiable impairment "could reasonably be expected to produce his pain."  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1160-61 (9th Cir. 2008) ("requiring that the medical impairment 'could reasonably be expected to produce' pain or another symptom . . . requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon").

Second, if a claimant shows that she suffers from an underlying medical impairment that could reasonably be expected to produce her pain or other symptoms, the ALJ must "evaluate the intensity and persistence of [the] symptoms" to determine how the symptoms, including pain, limit the claimant's ability to work. *See* 20 C.F.R. § 404.1529(c)(1).  General assertions that the claimant's testimony is not credible are insufficient. *See Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007). The ALJ must identify "what testimony is not credible and what evidence undermines the claimant's complaints." *Id.* (quoting *Lester*, 81 F.3d at 834).

In weighing a claimant's credibility, the ALJ may consider many factors, including, "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities."   *Smolen*, 80 F.3d at 1284; *see Orn*, 495 F.3d at 637-39. The ALJ also considers "the claimant's work record and observations of treating and examining physicians and other third parties regarding, among other matters, the nature, onset, duration, and frequency of the claimant's symptom; precipitating and aggravating factors; [and] functional restrictions caused by the symptoms . . . ."   *Smolen*, 80 F.3d at 1284 (citation omitted).

At this second step, the ALJ may reject a claimant's testimony regarding the severity of his or her symptoms only when there is "affirmative evidence" of malingering, or if the ALJ offers "clear and convincing reasons" for finding the claimant not credible.   *Carmickle*, 533 F.3d at 1160 (quoting *Lingenfelter*, 504 F.3d at 1036). "'The clear and convincing standard is the most demanding required in Social Security Cases.'" *Garrison*, 793 F.3d at 1015 (quoting *Moore v. Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

Here, there is affirmative evidence of malingering and, therefore, the ALJ was not required to meet the clear and convincing standard.  However, regardless, the Court finds that the ALJ provided sufficient reasons for discrediting Plaintiff's symptom testimony in this case.

### ii.    Analysis

The ALJ gave at least four sufficient reasons for discrediting Plaintiff's testimony regarding her symptoms.  First, the ALJ found "the record is fraught with references to [Plaintiff's] lack of forthright effort and suggestively manipulative behavior."  (AR 21.) In support of this finding, the ALJ cited to the findings of <u>three</u> different physicians that noted evidence of malingering.   The ALJ cited to examining physician Dr. Mark

Brecheisen's October 2009 determination that Plaintiff "gave inadequate effort," requiring additional testing to mitigate testing variances.  (*Id.* at 21, 435.)   After additional testing, Dr. Brecheisen noted that "[p]ost testing was not performed due to normal findings." (*Id.* at 435.)

The ALJ also cited to Dr. Daniel Chatel's November 2009 examination and findings.  (*Id.* at 21.)  Dr. Chatel noted that Plaintiff approached the evaluation process in a rather cavalier manner, and she "seemed evasive during the interview."  (*Id.* at 446.) Dr. Chatel found the following:

> [Plaintiff's] significant deficits in remote episodic memory, even for events unlikely to be related to psychological trauma, are unusual in the experience of this examiner.  In the context of her rather evasive and cavalier approach to the evaluation, it was decided to administer the Test of Memory Malingering (TOMM) before proceeding with further psychological testing. . . . Scores below 18 on any trial of the TOMM are quite unlikely to occur by chance.  [Plaintiff's] very low scores imply that she knew some of the pictures were correct, but intentionally picked the incorrect picture. At the very least, these low scores on the TOMM raise serious questions about [Plaintiff's] motivation to perform well on other neuropsychological tests.  Based upon these results, it was decided to discontinue further testing and conclude the examination.
>
> ….
>
> The results raised serious questions about [Plaintiff's] overall effort and approach to the evaluation process.  It was decided to discontinue testing since the results would be neuropsychometrically invalid and problematic for clinical interpretation.  These results do <u>not</u> imply that [Plaintiff] has no limitations with regard to her ability to participate in substantial work activities due to mental impairment.  On the contrary, it is clear from her history that [Plaintiff] has significant psychological difficulties.  Rather, [Plaintiff's] overall presentation today suggests that she was not putting forth maximum effort and may have been misrepresenting some of her psychological complaints.  As such, no valid conclusions can be drawn from today's results with regard to her ability to work.

(*Id.* at 446-47.)  In June 2010, Dr. Chatel examined Plaintiff again and noted her "[l]evel of effort during testing was somewhat variable again today." (*Id.* at 591.)  However, due to time constraints, Dr. Chatel did not administer another TOMM, and he proceeded with

1   psychological testing.  (*Id.*)  However, based on Plaintiff's approach to the evaluation,

2   Dr. Chatel found that in his opinion, "the results of IQ testing with the WAIS today may

3   not accurately reflect [Plaintiff's] true level of intellectual functioning."  (*Id.*)

4   The ALJ also cited to findings and conclusions by consultative examiner Dr.

5   Barker, based on a June 21, 2010 physical exam.  (*Id.* at 21.)  Dr. Barker summarized his

6   findings as follows:

> Client with a large functional overlay and multiple
> inconsistencies.  Examination of her knees failed to disclose
> any significant abnormality.  The client has no evidence of
> any back abnormality to correlate with the abnormal MRI.
> She has no evidence of chronic obstructive pulmonary
> disease, although, she is a smoker.  She does not have
> rheumatoid arthritis.  She does not give a history of migraine
> type headaches and it was explained to the client that the
> minimal need to examine her knees and back was required for
> this evaluation.  It was obvious even with the most gentle
> manipulations or touching of this client that she would cry out
> in severe pain indicating a functional overly in this client.
> The client would walk in the room holding on to her
> boyfriend but with distraction when the client was leaving she
> was able to ambulate briskly across the waiting room without
> evidence of any discomfort.  The client left in good condition.

16   (*Id.* at 584.)  The Court finds this overwhelming evidence, by <u>three</u> different examining

17   physicians, alone, is a sufficient basis to find Plaintiff's testimony does not reflect the

18   true intensity, persistence, and limiting impact of her symptoms.  *See Mohammad v.*

19   *Colvin*, 595 F. App'x 696, 697 (9th Cir. 2014) (unpublished) (finding the ALJ's

20   determination that the plaintiff was not "forthright" about her language abilities

21   supported an adverse credibility determination).

22   Second, the ALJ cited to numerous inconsistencies between Plaintiff's statements

23   and conduct that undermined her symptom testimony.  (AR 21.)  For example, during the

24   hearing, Plaintiff testified that her impairments caused her to stop working.  (*Id.* at 70.)

25   However, Plaintiff reported to Dr. Brecheisen that she quit her motel housekeeping job

26   because her boyfriend got a higher paying job and she no longer had to work, she

27   reported to Dr. Stephen Gill that she quit her job because her boyfriend got a job, and she

28   reported to Dr. Chatel that she quit working because she had to move after her boyfriend

got a different job.  (*Id.* at 20-21, 440, 445, 723.)   Additionally, the ALJ noted that Plaintiff reported she cannot drive due to her impairments.  (*Id.* at 21.)  Plaintiff also testified during the hearing that she tried to get a driver's license, but she did not pass the test.  (*Id.* at 71.)   However, Plaintiff reported that she had in fact obtained a driver's license, her license had been suspended in 2001, she did not seek to have it reinstated, and her ability to obtain a license was "complicated" by having a misdemeanor warrant in California.  (*Id.* at 21, 583, 723.)   The ALJ also noted Plaintiff's testimony that she completed fifth grade, her statement to Dr. Gill that she completed sixth or seventh grade, and her school transcripts, which show she attended high school until tenth grade.  (*Id.* at 18, 68, 334, 723.)   Further, Plaintiff reported that she can't understand food labels while shopping, but as the ALJ noted, Plaintiff was able to play video games and scrapbook, and was fitted for contacts, which presumably required her to identify letters and/or symbols.  (*Id.* at 24, 72.)   The ALJ also cited to Plaintiff's discharge in April 2010 from treatment due to testing positive for marijuana use, despite her "repeatedly adamant insistence that she has been clean from methamphetamine and marijuana for 5 years, including on June 25, 2010, two months after her positive drug screening."  (*Id.* at 22, 591, 627.)   Such inconsistencies in Plaintiff's statements and between her statements and her conduct are a sufficient basis on which to discredit Plaintiff's testimony.  *See Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) ("the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct.").

Third, the ALJ identified inconsistencies between Plaintiff's claims and other medical evidence in the record.  For example, the ALJ cited to normal findings from Plaintiff's April 2009 and June 2010 x-rays, which contradict Plaintiff's claim of disabling knee and back pain.  (AR 22, 373, 580-81.)  The ALJ also cited to Dr. Barker's examination findings, which note "negative bilateral straight leg raise testing, no cyanosis, no atrophy, edema, or radicular pain."  (*Id.* at 22, 583-84.)   The ALJ also cited to evidence indicating Plaintiff noted to Dr. Barker while she gets "migraine headaches" three times a day, she cannot identify how long they last, and the headaches are not

pounding, and they cause no nausea or visual problems.  (*Id.* at 23, 582-83.)  Dr. Barker noted that Plaintiff did "not give a history of migraine type headaches." (*Id.* at 583.)  The ALJ may give less weight to Plaintiff's symptom testimony based on inconsistencies with clinical findings and objective medical evidence.  *Carmickle*, 533 F.3d at 1161 ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony.").

Fourth, the ALJ found Plaintiff's daily activities are inconsistent with her claims that her symptoms are disabling.  (AR 17.)  At the hearing, Plaintiff claimed that she needs help shopping, and is illiterate.  (*Id.* at 71, 78.)  However, the ALJ cited to third party and Plaintiff's statements indicating that Plaintiff can prepare meals, engage with others freely, go outside, shop, and scrapbook daily.  (*Id.* at 17-18, 285-87, 552-53, 560-62.)  The ALJ also cited to Plaintiff's reports to Dr. Gill that she is able to maintain a normal sleep schedule, maintain her personal care, clean the house, play video games, go shopping, maintain a normal eating schedule, cook, complete errands, do dishes, attend doctor's appointments, watch tv, walk the dog, ride her bike, and felt she could handle money on her own.  (*Id.* at 17, 723.)  The Court finds that the inconsistencies between Plaintiff's testimony of her limitations and her daily activities is a valid basis for discrediting Plaintiff's testimony.[2]  *See Bray v. Astrue*, 554 F.3d 1219, 1227 (9th Cir. 2009) ("In reaching a credibility determination, an ALJ may weigh inconsistencies between the claimant's testimony and his or her conduct, daily activities, and work record, among other factors").

Plaintiff argues in her Reply that the inconsistencies in Plaintiff's statements and the evidence of malingering are all "consistent" with Plaintiff's illiteracy.  (Doc. 28 at 1-2.)  The Court disagrees.  Many of the examples of inconsistent statements and the

_____

[2] The Court recognizes the ALJ misstated that the record showed Plaintiff uses public transportation.  (*Id.* at 17, 553, 561, 723.)  It is unclear from the evidence whether Plaintiff cannot use public transportation or whether she chooses not to because rides from others she knows are available to her.  (*Id.* at 285.)  Regardless, the Court finds the other activities identified, in conjunction with the other reasons provided, are sufficient for finding Plaintiff's testimony regarding the intensity, persistence, and limiting effects of her alleged symptoms is not fully credible.

evidence of malingering to which the ALJ cited have nothing to do with an ability to read or write, including exaggerating symptoms during physical exams, intentionally misidentifying pictures, and inconsistent statements regarding the reasons she quit her job and whether she ever obtained a driver's license.

Plaintiff also argues in her Reply, for the first time, that in revising SSR 96-7p with SSR 16-3p to eliminate the use of the term "credibility," Defendant "has realized" that engaging in credibility determinations "is not proper" and "credibility is irrelevant to the determination of disability." (Doc. 28 at 1-2.) However, as Plaintiff notes, SSR 16-3p did not become effective until March 28, 2016, over two years after the ALJ's decision at issue in this case. (AR 28.) Further, although the SSR states that "we clarify that subjective symptom testimony evaluation is not an examination of an individual's character," it repeatedly states that in assessing an individual's description of his or her impairments and symptoms, Defendant will consider the consistency between the individual's statements and other record evidence. SSR 16-3p. Here, the ALJ identified numerous inconsistencies between Plaintiff's testimony and other record evidence.

For all the reasons above, the Court finds the ALJ's treatment of Plaintiff's testimony is free of harmful error and supported by substantial evidence.

**b. The ALJ's Alleged Failure to Follow the Appeals Council's Remand Order**

**i.   Plaintiff's Educational Records and Literacy**

Plaintiff also complains that the ALJ erred in failing to obtain and properly consider Plaintiff's educational records as ordered by the Appeals Council, and in failing to find that Plaintiff is illiterate. (Doc. 22 at 7-9.) Pursuant to 20 C.F.R. § 404.977, "[t]he administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." As stated above, the Council ordered the ALJ to "[o]btain school records, consider obtaining objective testing, and consider further intelligence testing to the extent indicated." (AR 128.) Plaintiff complains that the ALJ failed to

herself directly request Plaintiff's educational records. (Doc. 22 at 7.) However, Plaintiff appears to concede that she provided the ALJ with her educational records. Therefore, the ALJ had the records for review and any error in failing to obtain Plaintiff's educational records directly is harmless.

Plaintiff further complains that the ALJ failed to fully consider the educational records Plaintiff submitted, and the ALJ's failure to find Plaintiff illiterate is in error. (*Id.* at 7-8.) In evaluating a claimant's education, the Social Security Administration uses the following categories:

> (1) Illiteracy. Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.

> (2) Marginal education. Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.

> (3) Limited education. Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.

> (4) High school education and above. High school education and above means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above. We generally consider that someone with these educational abilities can do semi-skilled through skilled work.

20 C.F.R. § 416.964(b)(1)-(4). The Administration also emphasizes that "the numerical grade level that you completed in school may not represent your actual educational abilities. These may be higher or lower. However, if there is no other evidence to contradict it, we will use your numerical grade level to determine your educational abilities." 20 C.F.R. § 416.964(b).

In support of her argument that she is illiterate, Plaintiff cites to her own

statements that she cannot read or write and the grades she earned in ninth and tenth grades. In her decision, the ALJ mistakenly noted that Plaintiff attended high school through eleventh grade. (AR 18.) Although the records reflect Plaintiff only attended school until tenth grade, the Court does not find the ALJ's misstatement constitutes harmful error because ninth through eleventh grades are included within the category of "limited education." Plaintiff is correct that the records show she failed all of her classes in ninth grade except home economics, and it appears that Plaintiff withdrew from many of her classes in tenth grade. (*Id.* at 334.) However, Plaintiff appears to have received passing grades and partial credit in Painting and Drawing and Science in tenth grade. (*Id.*) Further, even if Plaintiff only attended full years of school through ninth grade, the records still indicate that she attended schooling four years longer than she claimed in her testimony. And, Plaintiff's failing grades in ninth grade and poor attendance do not conclusively establish that she is illiterate as Plaintiff suggests.

Further, contrary to Plaintiff's assertions otherwise, the ALJ considered other evidence in addition to Plaintiff's educational records regarding Plaintiff's literacy, which follows the Appeals Council's directive to attempt "to resolve the issue of whether [Plaintiff] is illiterate." The ALJ cited to medical records indicating that Plaintiff has no barriers to learning and noted that her inability to read is inconsistent with records showing she was able shop independently,[3] play video games, and scrapbook. (AR 18.) The ALJ also noted statements to Dr. Gill regarding the amount of schooling she obtained and her efforts to obtain a GED, which are inconsistent with her testimony. (*Id.*) Further, the ALJ noted Dr. Gill's determination that Plaintiff's IQ is in the 70's, and evidence suggesting that Plaintiff was malingering regarding symptoms during mental examinations, which included evidence that Plaintiff intentionally misidentified pictures. (*Id.* at 21, 444-49.) Additionally, the ALJ cited to evidence that Plaintiff previously obtained a driver's license and was fitted for and wore contacts, which presumably would

---

[3] Although, as detailed below, Plaintiff disputes she is able to shop independently, Plaintiff asserts in her briefing that she "agrees with ALJ Bucci's logic that the ability to shop independently would be inconsistent with illiteracy . . ." (Doc. 22 at 12.)

require recognition of words, letters, and symbols.  (*Id.* at 21.)[4]

Taken together, the Court finds that the ALJ sufficiently complied with the Appeals Council's directive to further address whether Plaintiff is illiterate, including review of Plaintiff's educational records, and the ALJ's determination that Plaintiff has limited education is supported by substantial evidence.

## ii.   The ALJ's Treatment of Plaintiff's Mental Impairments

As Plaintiff notes, the Appeals Council remanded this matter to the ALJ to "[f]urther evaluate [Plaintiff's] mental impairments in accordance with the special technique described in 20 CFR 416.920a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 416.920a(c)."  (*Id.* at 129.)  20 C.F.R. § 416.920a describes the special technique the ALJ must use to evaluate the severity of mental impairments, which includes rating the degree to which Plaintiff is limited in four broad functional areas: (1) activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  20 C.F.R. § 416.920a(c)(3).  Section 416.920a(c)(4) provides that the ALJ will "rate the degree of limitation in the first three functional areas . . . us[ing] the following five-point scale:  None, mild, moderate, marked, and extreme.  When [the ALJ rates] the degree of limitation in the fourth functional area (episodes of decompensation), [she] will use the following four-point scale:  None, one or two, three, four or more."  If the ALJ finds that Plaintiff has a severe mental impairment, the ALJ will then determine if the impairment meets or is equivalent in severity to a listed mental disorder.  20 C.F.R. § 416.920a(d)(2).  If the ALJ finds that it does not, she will then assess Plaintiff's RFC.  20 C.F.R. § 416.920a(d)(3).

At step two, the ALJ found that Plaintiff suffers from severe mental impairments of post-traumatic stress disorder (PTSD), major depressive disorder with history of

---

[4] Dr. Gill also found during the Mental Status Exam of Plaintiff that although she had trouble with spelling, she could read and write a simple sentence, she repeated a complex phrase, and she followed a 3-stage command.  (AR 724.)  The ALJ generally found Dr. Gill's examination probative in assessing Plaintiff's RFC.  (*Id.* at 25.)

psychosis, borderline intellectual functioning, and drug and alcohol abuse (DAA) in remission.  (AR 14-15.)  The ALJ further found that Plaintiff's mental impairments did not meet Listings 12.02, 12.04, 12.06, and 12.09.  (*Id.* at 15.)  With regard to the four functional areas, the ALJ found that Plaintiff has no restriction in activities of daily living, has mild to moderate difficulties in social functioning, has moderate difficulties with concentration, persistence or pace, and has experienced no extended episodes of decompensation.  (*Id.* at 17-18.)

### 1.  Intellectual Functioning

Plaintiff appears to first argue that the ALJ erred in her conclusions regarding Plaintiff's intellectual functioning.  (Doc. 22 at 10-11.)  The ALJ cited to Dr. Gill's findings that Plaintiff's score on the Bender Gestalt Test Second Edition placed her "in the borderline range of intellectual functioning."  (AR 724.)  However, Dr. Gill also found the following:

> For a Verbal Comprehension score of 70, Percentile Reasoning of 82, Working Memory of 55, Processing Speed of 71 for a Full-Scale IQ of 65 placing the patient in the mildly mentally retarded range of intellectual functioning.  It should be noted that the patient was wearing new contacts and appeared nervous and she tended to give up easily.  In the opinion of this evaluator, her true intellectual level is in the 70s and is in the borderline range with learning problems noted particularly on verbal tasks and on working memory tasks and on processing speed.

(*Id.* at 725.)  The ALJ also cited to Dr. Chatel's report suggesting that Plaintiff intentionally provided incorrect answers to increase her level of impairment.  (*Id.* at 17.) Finally, the ALJ cited to what she characterized as a full range of activities of daily living, including Plaintiff's ability to run errands and shop independently.  Based on this evidence, the ALJ found that Plaintiff's IQ score is not reliable and does not warrant a finding of disability.  (*Id.*)

Plaintiff generally objects to the ALJ's findings because she claims that Dr. Gill noted significant impairments in all areas which required reading, writing, and mathematical skill, and in her ability to avoid hazards and exercise social judgment.

(Doc. 22 at 11.)   However, the Court finds that the ALJ properly found, based on Dr. Gill's own assessment that Plaintiff's IQ was in the 70s range, and the evidence regarding Plaintiff's daily activities, discussed in more detail below, that Plaintiff is in the borderline intellectual functioning category and does not meet Listing 12.05.[5]

## 2.  Plaintiff's Daily Activities

Plaintiff also challenges the ALJ's determination that Plaintiff has no restrictions in her daily activities.  (*Id.* at 11-13.)   Plaintiff cites to statements by third parties and Plaintiff that Plaintiff is limited in cooking, household chores, handling finances, and social interaction.   However, the ALJ cited to Plaintiff's statements to Dr. Gill and Dr. Brecheisen regarding her ability to engage in daily activities.  (AR 17-18.)   Specifically, Plaintiff reported to Dr. Gill that she is able to cook, clean, run errands, shop, take walks, and ride her bike.   (*Id.* at 17, 723.)   In finding Plaintiff is "able to maintain an active lifestyle," the ALJ also cited to Dr. Brecheisen's Report, which notes Plaintiff stated she "is able to perform all activities of daily living such as personal grooming, shopping, and house work, etc.; and is only mildly limited when the activity is exertional such as extended periods of vacuuming or mopping, etc.," but she can resume the activity after taking one or two rest breaks and occasionally using an inhaler. (*Id.* at 18, 440.)   Further, the ALJ cited to inconsistent statements by Plaintiff regarding the reason for her inability to drive, and Functional Reports that indicate Plaintiff cannot drive because she does not have a license, not because she is disabled.  (*Id.* at 21, 553, 561, 723.)   Therefore, the Court finds the ALJ's determination regarding Plaintiff's daily activities is supported by substantial evidence.

## 3.  Concentration, Persistence, or Pace

Plaintiff also asserts the ALJ's conclusion that Plaintiff has only moderate limitations in concentration, persistence, or pace is not supported by substantial evidence. (Doc. 22 at 13-14.)  The Court disagrees.  The ALJ supported her conclusion by citing to

---

[5] Plaintiff concedes that Dr. Gill did not find Plaintiff meets the definition of Listing 12.05.  (*Id.* at 10.)

Plaintiff's inconsistent statements regarding her schooling.  (*Id.* at 18.)  Plaintiff testified that she only attended school through fifth grade; however, she reported to Dr. Gill she completed sixth or seventh grade and sought to obtain her GED, and her educational records indicate that she attended school until tenth grade.  (*Id.* at 68, 334, 723.)  The ALJ also cited to the evidence discussed above that Plaintiff intentionally scored poorly on diagnostic examinations, Plaintiff's ability to engage in daily activities, and her hobbies of scrapbooking and playing video games, which both require some extended concentration.  (*Id.* at 18, 295, 562, 723.)  The ALJ further cited to two emergency room visits that indicate Plaintiff has no barriers to learning.  (*Id.* at 480, 509.)  Finally, the ALJ cited to records indicating Plaintiff's concentration, immediate recall, recent memory, remote memory, and attention are all fair.  (*Id.* at 668, 673.)  The Court finds, based on this evidence, that the ALJ's conclusion that Plaintiff is moderately limited in concentration, persistence, or pace is supported by substantial evidence.

### 4.  Social Functioning

Finally, Plaintiff asserts the ALJ's conclusion that Plaintiff has mild to moderate difficulties in social functioning is not supported by substantial evidence.  (Doc. 22 at 14.)  The ALJ supported her finding by citing to evidence indicating that Plaintiff is able to maintain contact with her family and live in close proximity to her boyfriend and adult son, Plaintiff has been noted to maintain an appropriate affect and mood throughout the record, and mental health treatment records note she is anxious, but cooperative, able to maintain eye contact, has appropriate affect, logical thought process, reliable judgment and insight, and full orientation.  (AR 18, 282, 550, 663, 668, 673, 698-99.)  The ALJ also cited to Plaintiff's statements that she spends considerable time with her grandchildren and receives support from her boyfriend and son's father.  (*Id.* at 685.)  Finally, the ALJ cited to Plaintiff's gaps in treatment and lack of need for psychiatric hospitalization as a basis for her finding regarding Plaintiff's social functioning.  (*Id.* at 18.)

The only argument Plaintiff makes regarding the ALJ's treatment of Plaintiff's

social functioning is to generally assert that Plaintiff "is illiterate, with her ability to function socially primarily impacted by her poor communicative skills due to her illiteracy." (Doc. 22 at 14.)   However, Plaintiff fails to provide any citation to the record to support that claim.

In sum, in compliance with the Appeals Council's remand order, the ALJ evaluated Plaintiff's mental impairments as required under 20 C.F.R. § 416.920a, including analysis of the four broad functional areas.[6]  The Court finds the ALJ's analysis is supported by substantial evidence.

### iii.   Weighing of Medical Opinion Evidence

Plaintiff argues that the ALJ erred in failing to comply with the Appeal Council's directive to evaluate the medical source opinions in accordance with 20 C.F.R. § 416.927, and to explain the weight given to the opinion evidence.   (Doc. 22 at 15-20.)   Plaintiff further argues that the ALJ erred in the weight she assigned to all of the treating and non-treating medical sources.   (*Id.*)   As detailed below, the Court finds that the ALJ's treatment of the medical opinion evidence complies with the Appeal Council's remand order, is without harmful legal error, and is supported by substantial evidence.

### 1.  Legal Standard

The Ninth Circuit distinguishes between the opinions of treating physicians, examining physicians, and non-examining physicians.  *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, an ALJ should give greatest weight to a treating physician's opinion and more weight to the opinion of an examining physician than to one of a non-examining physician.  *See Andrews*, 53 F.3d at 1040-41; *see also* 20 C.F.R. § 404.1527(c)(2)-(6).  If it is not contradicted by another doctor's opinion, the opinion of a treating or examining physician can be rejected only for "clear and convincing" reasons.  *Lester*, 81 F.3d at 830 (citing *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).  "If a treating or examining doctor's opinion is contradicted by another doctor's

---

[6] Plaintiff does not challenge the ALJ's conclusion regarding episodes of decompensation.

opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Garrison*, 759 F.3d at 1012 (quoting *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

An ALJ can meet the "specific and legitimate reasons" standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986). But "[t]he ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Embrey*, 849 F.2d at 421-22. "The opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining *or* a treating physician." *Lester*, 81 F.3d at 831 (emphasis in original) (citations omitted). 20 C.F.R. § 416.927(c) provides that unless a treating physician is given controlling weight, the ALJ will consider factors such as length, nature, and extent of the treating or examining relationship, supportability, consistency, and specialization, in evaluating medical opinion evidence.

### 2.  Non-examining Physician Dr. Nicole Lazorwitz

Plaintiff first argues that the ALJ erred in giving the opinions of non-examining physician, Dr. Lazorwitz, significant weight. (Doc. 22 at 15-16.) Dr. Lazorwitz opined that Plaintiff "has the basic cognitive and emotional skills to perform simple, repetitive tasks in a competitive 40-hour work week environment with limited public contact on a sustained basis." (AR 104.) In support of her opinions, Dr. Lazorwitz provided a detailed summary of the findings during Dr. Chatel's examination of Plaintiff, and medical record evidence, including notes that Plaintiff has poor memory but fair abstraction, attention, concentration, judgment and insight, and Plaintiff's intellect equals fund of knowledge is intact, as well as evidence regarding Plaintiff's daily activities. (*Id.* at 96-98.) Based on the evidence of malingering and Plaintiff's inconsistent statements discussed above, Dr. Lazorwitz found Plaintiff only partially credible.

The ALJ gave Dr. Lazorwitz's opinions "substantial weight" because she provided

specific reasons for her opinions and her opinions are well supported throughout the medical evidence record. (*Id.* at 24.) Plaintiff complains that the ALJ did not provide any specific citations to the medical evidence. However, as discussed above, the ALJ discussed in detail Dr. Chatel's examination of Plaintiff, evidence of Plaintiff's malingering during examinations, Plaintiff's statements regarding her daily activities, and medical records stating Plaintiff has fair abstraction, attention, concentration, and judgement and insight, all of which Dr. Lazorwitz discussed and relied on in forming her opinions. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record."). Notably, Plaintiff does not identify how Dr. Lazorwitz's opinions are inconsistent with any other medical evidence in the record. Therefore, the Court finds that the ALJ did not err in giving substantial weight to Dr. Lazorwitz's opinions, and the ALJ's determination is supported by substantial evidence.

### 3. Examining Physician Dr. Robert Barker

Plaintiff also asserts that the ALJ erred in giving Dr. Barker's opinions great weight. (Doc. 22 at 16.) Dr. Barker examined Plaintiff on June 21, 2010. (AR 582-88.) Based on his examination, Dr. Barker opined that Plaintiff can lift up to 50 pounds occasionally and up to 25 pounds frequently. (*Id.* at 585.) He opined that Plaintiff has no limitations in standing, walking, sitting, seeing, hearing, and speaking. (*Id.* at 586.) Dr. Barker further opined that Plaintiff can frequently climb ramp/stairs, and occasionally climb ladders, ropes, and scaffolds. (*Id.*) Finally, Dr. Barker opined that Plaintiff can occasionally crouch, and has no environmental restrictions. (*Id.* at 586-87.)

The ALJ found that Plaintiff would have additional environmental limitations due to her asthma condition, but gave Dr. Barker's opinions as to Plaintiff's other physical limitations great weight, citing to his examination results finding no back abnormality, his finding that Plaintiff does not have RA after his examination and review of her medical records, his observations of Plaintiff's extreme and over exaggerated pain

sensitivity, but unimpaired demonstration while she was distracted, and the consistency between Dr. Barker's opinions and Plaintiff's treatment record.  (*Id.* at 24.)

The Court finds the ALJ's treatment of Dr. Barker's opinions is without error and supported by substantial evidence.  Dr. Barker examined Plaintiff and observed she sat comfortably, could heel-toe and toe-walk, and she had no difficulty undressing and dressing.  (*Id.* at 583.)  Plaintiff had her boyfriend help her onto the table, however, later, when leaving and distracted, Dr. Barker noted that Plaintiff "was able to ambulate briskly across the waiting room without evidence of any discomfort."  (*Id.* at 584.)  Similarly, Dr. Barker found Plaintiff overreacted during the examination, crying out in response to the slightest touch.  (*Id.*)  Upon examination, Dr. Barker found Plaintiff's spinal confirmation was normal without spasm, there was no pain with straight leg raising in the sitting position and not in the left leg while lying down, internal and external rotations of the hip were normal without any evidence of discomfort, there was no evidence of inflammation or deformity of Plaintiff's knees and no swelling, she had no radicular pain, and she had a full range of motion of all joints in all directions.  (*Id.*)  Based on his examination and review of her records, Dr. Barker opined that Plaintiff does not have RA.  (*Id.*)  His normal examination findings support his opinions.  *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) ("Dr. Schatz's opinion alone constitutes substantial evidence, because it rests on his own independent examination of Tonapetyan.").

The ALJ also found that Dr. Barker's opinions are consistent with Plaintiff's treatment records.   The ALJ detailed other medical records that show similar results to Dr. Barker's examination and are consistent with his opinions, including June 2010 x-rays that showed "no advanced degenerative disease" and "no compression fracture or acute osseous abnormality" and a "normal lumbar spine."  (AR 22, 580-81.)  The ALJ specifically discussed Dr. Barker's examination findings that Plaintiff has "no evidence of any back abnormality to correlate with the abnormal MRI," and his findings that Plaintiff was negative for straight leg testing, and had no cyanosis, atrophy, edema, or radicular pain.  (*Id.* at 22, 584.)  The Court finds the ALJ's treatment of Dr. Barker's

1    opinions is supported by substantial evidence.  *Thomas*, 278 F.3d at 957 ("The opinions

2    of non-treating or non-examining physicians may also serve as substantial evidence when

3    the opinions are consistent with independent clinical findings or other evidence in the

4    record.").

5         Plaintiff argues that Dr. Barker did not actually conduct an examination of

6    Plaintiff, "which is consistent with Barker's habitual falsification of his medical reports."

7    (Doc. 22 at 16.)  First, the record indicates that Dr. Barker examined Plaintiff on June 21,

8    2010.  (AR 582-84.)  Plaintiff provides no basis for her unsupported assertion otherwise.[7]

9    Likewise, Plaintiff's assertion that Dr. Barker "habitual[ly] falsifi[es]" records is

10   unsupported.  Plaintiff cites to an Order by another Court in this District in *Orndoff v.*

11   *Astrue*, No. CV-10-1098-PHX-LOA, Doc. 21 (D. Ariz. July 25, 2011).  However, the

12   Court in that case noted the following:

13   > Plaintiff argues that Dr. Barker incorrectly reported that she
14   > climbed stairs during his examination which was conducted
     > "on the first floor of a Quality Inn in Kingman, Arizona."
15   > (*Id.*) Plaintiff's counsel states that he "has been to that motel
     > and there are no stairs on the first floor." (*Id.*) Counsel's
16   > observation on some unspecified time and date of the location
     > where the examination took place is not relevant to this
17   > Court's review of the administrative decision at issue.
     > Plaintiff does not provide any reason for Dr. Barker's alleged
18   > inaccuracy in his report regarding his examination of
     > Plaintiff. Moreover, Plaintiff testified during the
     > administrative hearing that she could climb steps. (Tr. 15-16).
19

20   *Orndoff*, Doc. 21 at 18-19.

21        Notably, the Court's Order does not find that Dr. Barker falsified records.   In her

22   Reply, Plaintiff cites to an additional Order by another Court in this District in *Wade v.*

23   *Astrue*, No. CV-12-0186-PHX-DGC, Doc. 23 (D. Ariz. January 25, 2013).  (Doc. 28 at

24   _____

25        [7] In her Reply, Plaintiff asserts that Dr. Barker did not sufficiently examine
     Plaintiff for RA because it is not a back impairment and requires blood testing.  (Doc. 28
26   at 4.)  However, Plaintiff fails to provide any authority to support that proposition.
     Further, as detailed above, Dr. Barker also found during his examination that Plaintiff
27   over exaggerated her pain, had full mobility in her joints, and failed to disclose any heat,
     swelling, deformity, crepitation, or instability in her knees.  (AR 584.)  And, as detailed
28   above, Dr. Barker reviewed Plaintiff's medical records.  (*Id.* at 582.)  Therefore, the
     Court rejects Plaintiff's claim that Dr. Barker did not examine Plaintiff.

5.) But the Court in that case did not find Dr. Barker falsified records.[8]  Finally, Plaintiff cites to separate criminal proceedings Plaintiff claims relate to convictions against Dr. Barker for domestic violence and disorderly conduct.  (Doc. 28. at 5-6 n.1.)  To the extent Plaintiff seeks to make some argument regarding Dr. Barker's general character, such an argument is entirely irrelevant to the issues before this Court.  Plaintiff fails to provide any basis for her claim that Dr. Barker falsified any records in this case.[9]  For the reasons above, the Court finds that the ALJ's treatment of Dr. Barker's opinions is free from error and supported by substantial evidence.

### 4.  Non-examining Physician Dr. J. M. Kelly

Plaintiff also discusses the non-examining opinions of Dr. Kelly.  (Doc. 22 at 16-17.)  The ALJ gave Dr. Kelly's opinions little weight.  (AR 24.)  However, Plaintiff fails to specifically identify any error in the ALJ's treatment of Dr. Kelly's opinions.  Rather, Plaintiff appears to argue that Dr. Kelly's opinions deserve no weight.  Therefore, the Court will not analyze Dr. Kelly's opinions further.

### 5.  Examining Physician Dr. Gill

Plaintiff also complains that the ALJ erred in giving Dr. Gill's opinions "little weight."  (Doc. 22 at 17.)  However, the ALJ properly gave Dr. Gill's opinions little weight because those opinions are vague and imprecise and inconsistent with his own observation that due to Plaintiff giving up easily, the testing would undervalue her true abilities.  (AR 24-25.)  As the ALJ noted, Dr. Gill opined that: (1) Plaintiff "appears slow in responding to simple questions and instructions and in recalling information consistent with her limitation in learning and cognition'; (2) "sometimes loses control of her

---

[8]  The Court made one finding regarding Dr. Barker.  "The Court concludes that any error in how the ALJ weighed Dr. Barker's opinion is harmless because the ALJ imposed more limitations in Plaintiff's RFC than Dr. Barker recommended, and these additional limitations benefit Plaintiff." *Wade v. Astrue*, No. CV-12-0186-PHX-DGC, 2013 WL 308726, at *8 (D. Ariz. Jan. 25, 2013). This case provides no support for Plaintiff's claim that Dr. Barker falsified medical evidence. Plaintiff's claim was also made in a Reply pleading, which limited Defendant's ability to respond.

[9]  Plaintiff's counsel is cautioned against making such clearly unsupported statements to this Court in the future.

emotions and is otherwise prone to some distractibility," and "gives up easily, so this is a complication in terms of her concentration abilities"; (3) Plaintiff "appears to have some contact with others on a social basis," but "[f]or the most part, she stays to herself and stays close to home"; and (4) Plaintiff "has done a lot of moving in the last several years, although she has spen[t] most of her time in Arizona in the last six years."  (*Id.* at 726.)  However, Dr. Gill also noted he did not understand why Plaintiff did not return to her prior work as a maid, Plaintiff's tendency to give up easily resulted in a WAIS-IV score undervaluing her true cognitive ability, and Plaintiff was not in any regular mental health treatment.  (*Id.* at 725, 727.)  *Tonapetyan*, 242 F.3d at 1149 (holding that the ALJ properly rejected a physician's testimony because "it was unsupported by rationale or treatment notes, and offered no objective medical findings to support the existence of [the claimant's] alleged conditions"); *Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (An ALJ may discredit a physician's opinions that are conclusory, brief, and unsupported by the record as a whole, or by objective medical findings).

Plaintiff generally asserts that the ALJ should have given Dr. Gill's opinions additional weight because those opinions are "consistent with [Plaintiff's] treating physician's findings."  (Doc. 22 at 17.)  However, Plaintiff fails to support her assertion with any citation to the record.  Therefore, based on the above, the Court finds that the ALJ's treatment of Dr. Gill's opinions is free of error and supported by substantial evidence.

### 6.  Examining Physician Dr. Chatel

Plaintiff also argues that the ALJ should have given Dr. Chatel's opinions great weight.  (Doc. 22 at 17-18.)  Dr. Chatel examined Plaintiff in November 2009 and June 2010.  (AR 444-49, 589-95.)  As detailed above, during the 2009 examination, Dr. Chatel had such serious concerns regarding Plaintiff's "evasive and cavalier approach to the evaluation," that he administered a TOMM.  (*Id.* at 446.)  Dr. Chatel concluded based on that exam that Plaintiff's "very low scores imply that she knew some of the pictures were correct, but intentionally picked the incorrect picture.  At the very least, these low scores

on the TOMM raise serious questions about [Plaintiff's] motivation to perform well on other neuropsychological tests." (*Id.*) Dr. Chatel then discontinued the evaluation because the TOMM "results raised serious questions about [Plaintiff's] overall effort and approach to the evaluation process," and "the results would be neuropsychometrically invalid and problematic for clinical interpretation." (*Id.* at 446-47.)

During the June 2010 exam, Dr. Chatel noted that Plaintiff's "[l]evel of effort during testing was somewhat variable again today," but, due to time constraints, Dr. Chatel did not administer another TOMM. (*Id.* at 591.) However, Dr. Chatel noted that in his opinion, "the results of the IQ testing with the WAIS today may not accurately reflect [Plaintiff's] true level of intellectual functioning." (*Id.*) Further, Dr. Chatel noted that Plaintiff's "affect was rather unusual in that she seemed to approach the evaluation process in a rather cavalier manner." (*Id.* at 592.) Despite his concerns regarding Plaintiff's behavior during the 2010 examination, and the validity of testing regarding her intellectual functioning, Dr. Chatel opined in a July 8, 2010 Psychological/Psychiatric Medical Source Statement that Plaintiff is severely impaired in understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (*Id.* at 594.)

The ALJ gave Dr. Chatel's opinions minimal weight in part because his findings are not supported by his own observations of Plaintiff being a poor historian, her cavalier approach to the evaluation process, and Plaintiff's misrepresentation of her impairments, which is consistent between both of Dr. Chatel's evaluations, and based on his own opinions that the results of the psychological testing would be invalid. (*Id.* at 25-26.) The Court finds the inconsistencies between Dr. Chatel's observations and examination findings and his opinions regarding Plaintiff's work limitations, as well as his specific opinions that the IQ testing he administrated may not be accurate, and would be "problematic for clinical interpretation," are sufficient reasons for giving his opinions regarding Plaintiff's work limitations minimal weight, and are supported by substantial evidence in the record. *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (An ALJ may

reject a physician's opinions that are "inconsistent with other substantial evidence in the record"); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (stating that an ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings).[10]

### 7. Treating Physician Dr. Thomas Handeguand

Finally, Plaintiff asserts that the ALJ erred in giving the opinions of a treating source, Dr. Handeguand, little weight. (Doc. 22 at 18-20.) Dr. Handeguand opined that Plaintiff's abilities to follow work rules, relate to co-workers, interact with supervisors, and use judgment are good; her abilities to deal with the public, function independently, and deal with work stresses are fair; and her ability to maintain attention/concentration is poor. (AR 747.) He further opined that Plaintiff's ability to understand, remember, and carry out simple job instructions is good, while her ability to understand, remember, and carry out detailed, but not complex, job instructions is poor. (*Id.* at 748.) Dr. Handeguand rated Plaintiff's ability to maintain personal appearance, to behave in an emotionally stable manner, and demonstrate reliability as good, and her ability to relate predictably in social situations as fair.[11] (*Id.*)

Dr. Handeguand also completed a Medical Source Statement of Physical Ability to Do Work-Related Activities form. (*Id.* at 749.) On that form, he opined that Plaintiff can

---

[10] The ALJ also asserted that she gave Dr. Chatel's opinions minimal weight because those opinions are not specific work limitations she could fully analyze as required by SSR 96-7p, and his opinions are inconsistent with Plaintiff's lack of mental health treatment since January 2012 where she wanted medication but refused counseling support. (*Id.* at 25-26.) The Court finds these reasons are not supported by substantial evidence based on the records cited by the ALJ. However, as detailed above, inconsistencies between Dr. Chatel's examination findings and his opinions, and his own determination that the results of the testing he administered would not be valid due to Plaintiff's lack of effort, alone, are sufficient to give his opinions minimal weight. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (an error is harmless if it is "inconsequential to the ultimate nondisability determination.").

[11] The Mental Ability to Do Work-Related Activities Form defines "Good" as "Ability to function in this area is significantly limited but satisfactory; "Fair" as "Ability to function in this area is seriously limited, but not precluded; and "Poor" as "No useful ability to function in this area." (*Id.* at 747.)

occasionally and frequently lift up to 10 pounds, can stand and/or walk for one hour in an eight hour work day, and can sit for two hours during that same time period.  (*Id.* at 749.)  He further opined that Plaintiff can never climb, balance, stoop, kneel, crouch, or crawl, is limited to 25 percent for reaching and handling, and is limited to 30 percent for fingering, and is unlimited in feeling, seeing, hearing, and speaking.  (*Id.* at 750.)  He also opined that Plaintiff is limited in heights, moving machinery, temperature extremes, chemicals, and dust.  (*Id.*)  Finally, Dr. Handeguand opined that Plaintiff would need to miss "much more" than four days of work a month due to her limitations.  (*Id.*)

The ALJ gave Dr. Handeguand's opinions regarding Plaintiff's concentration, persistence, or pace, ability to understand, remember, and carry out detailed, but not complex, instructions, social functioning, and ability to function independently little weight because they are inconsistent with the daily activities Plaintiff reported to others, including that, on a daily basis, she is able to maintain a normal sleep schedule, maintain her personal care, clean her house, go shopping, maintain a normal eating schedule, cook, complete errands, do dishes, attend doctor's appointments, watch television, and play video games.  (*Id.* at 26.)  The ALJ also gave the physical limitations opined by Dr. Handeguand little weight based on the examination findings and opinions of Dr. Barker and the non-examining opinions of Dr. Orenstein, and concluded that there was a lack of an objective assessment to support Dr. Handeguand's opinions.  (*Id.*)

Plaintiff complains that the ALJ erred in relying on Dr. Barker's opinions and findings and in assuming Dr. Handeguand's opinions are merely those of a "sympathetic treatment provider."  (*Id.* at 22-23.)  However, as detailed above, the ALJ properly gave Dr. Barker's opinions significant weight, and, even if the ALJ's statement regarding Dr. Handeguand's sympathy towards Plaintiff is itself not supported by substantial evidence, the other evidence the ALJ cited and discussed is sufficient.  Therefore, the Court finds that the ALJ's treatment of Dr. Handeguand's opinions is free of harmful error and supported by substantial evidence.  *Orn,* 495 F.3d at 631; *Batson*, 359 F.3d at 1195.

### iv.   The ALJ's Evaluation of Plaintiff's Sleep Apnea and RA

Plaintiff also asserts that the ALJ committed harmful error by failing to consider Plaintiff's RA and sleep apnea as ordered by the Appeals Council.  (Doc. 22 at 20.)  The Court disagrees.

As an initial matter, contrary to Plaintiff's assertion otherwise, the Appeals Council did not instruct the ALJ to find that Plaintiff's sleep apnea and RA are severe impairments.  (Doc. 22 at 16; AR 128-29.)  Rather, the Council noted that the initial decision "contains no assessment of whether obstructive sleep apnea, major depression with psychosis, and [RA] constitute severe impairments."  (AR 128.)  The Appeals Council instructed the ALJ to "if necessary, obtain evidence from a medical expert to clarify the nature and severity of the claimant's impairments."  (*Id.* at 129.)

With regard to sleep apnea, the ALJ found that upon review of the medical evidence record, including Plaintiff's treating records, Plaintiff was able to manage her sleep apnea with nightly supplemental oxygen.  (*Id.* at 23.)  The ALJ noted that Plaintiff's treating source diagnosed her with mild symptomatic obstructive sleep apnea with hypoxemia.  (*Id.* at 22, 536.)  The ALJ further cited records that show Plaintiff elected to use supplemental oxygen as treatment for her condition, and she reported effective results with that treatment.  (*Id.* at 22-23, 536, 570.)  Plaintiff argues only that Plaintiff's "treating pulmonologist did find such condition severe."  (Doc. 22 at 21.)  However, the record evidence Plaintiff cites to support this assertion states that Plaintiff's treating physician diagnosed Plaintiff with <u>mild</u> symptomatic obstructive sleep apnea with hypoxemia, Plaintiff found the additional oxygen prescribed to be helpful, and she refused the additional treatment offered by her physician.  (AR 538, 570, 573.)  The Court finds the ALJ's treatment of Plaintiff's sleep apnea is in accordance with the Appeals Council's remand order and is supported by substantial evidence.

With regard to Plaintiff's RA, the ALJ cited several examples of medical evidence, including Dr. Barker's findings during his examination of Plaintiff, to support the ALJ's conclusion that Plaintiff's RA, to the extent she has the condition, is not severe.

First, the ALJ noted that although Plaintiff was initially diagnosed with RA in August 2009 based on a positive RA factor, Plaintiff was not referred to a Rheumatologist, and a subsequent June 2010 blood test revealed Plaintiff had normal antibodies and a negative ANA screen.  (*Id.* at 23, 365, 576.)  The ALJ further cited to normal MRI results.  (*Id.* at 23, 371-72, 615, 621.)   The ALJ also gave weight to Dr. Barker's conclusion that Plaintiff does not have RA based on his review of Plaintiff's medical records and his physical examination results as discussed above, which the ALJ found consistent with Plaintiff's treating source's note that on February 22, 2011, Plaintiff exhibited 5/5 upper extremity strength, bilateral hand grip strength, and full finger flexion.  (*Id.* at 23, 626.)

Based on the above, the Court finds the ALJ sufficiently considered Plaintiff's sleep apnea and RA and her conclusions that these conditions are not severe is free of error and supported by substantial evidence.

### v.   The ALJ's Failure to Obtain Additional Evidence

Plaintiff also appears to generally complain that the ALJ failed to comply with the Appeals Council's order by failing to obtain additional evidence, including medical evidence regarding the severity of Plaintiff's impairments.  (Doc. 22 at 7.)  However, the Appeals Council ordered the ALJ to obtain additional medical evidence if necessary, warranted, and available.  (AR 129.)  Here, as thoroughly set forth above, the ALJ provided sufficient reasons for her findings in weighing the opinion evidence and in assessing Plaintiff's impairments.  Further, Plaintiff fails to specifically identify any additional evidence that was available, that would have assisted the ALJ in assessing Plaintiff's functional limitations, and that the ALJ should have obtained.  Therefore, the Court finds that the ALJ complied with the Appeals Council's directives regarding obtaining additional evidence.

### vi.   The ALJ's Alleged Failure to Address an Apparent Conflict Between the VE's Testimony and Plaintiff's Illiteracy

Finally, Plaintiff alleges that the ALJ failed to address a conflict between the occupations the ALJ found Plaintiff could perform and Plaintiff's illiteracy, citing to *Zavalin v. Colvin*, 778 F.3d 842, 844 (9th Cir. 2015).  More specifically, Plaintiff alleges

that she "cannot be expected to sustain work as Janitor, Housekeeper, or Dishwasher as she is incapable of even basic reading and writing."  (Doc. 22 at 9.)

The Court finds that the ALJ properly relied on the VE's testimony in determining that Plaintiff can perform other work.  First, as detailed above, the ALJ's determination that Plaintiff is not illiterate is supported by substantial evidence.  Second, there is no apparent conflict between the DOT occupations of housekeeper and dishwasher the VE testified Plaintiff can perform and her limited education or the limitations the ALJ included in the assessed RFC, including a limitation to simple, repetitive tasks, occasional interaction with the public, co-workers, and supervisors, and that Plaintiff should not use a cash register or be required to read as a primary job duty.  (AR 19-20.)

The parties agree that the positions of housekeeper and dishwasher require a language level of 1, which requires recognizing 2,500 words, reading at a rate of 95-120 words per minute, and comparing similarities and differences between words and between series of numbers.  Dictionary of Occupational Titles, Appendix C, 1991 WL 688702.  Further, language level 1 requires printing simple sentences and speaking in simple sentences.  (*Id.*)  The ALJ found Plaintiff had limited education, which includes the ability to read, write, and speak on a basic level.  The ALJ included Plaintiff's limited education, and limitations on using a cash register and reading being a primary job duty in her hypothetical to the VE.  The VE also further clarified in response to questions from Plaintiff's attorney that the only reading that would be required in the housekeeping position would be recognizing colors, the shape of a bottle, and "reading at the most basic, basic level."  (AR 81-83.)  Even if the janitor position, which requires a language level of 2, conflicts with the limitations in reading and math included by the ALJ in the RFC and Plaintiff's limited education, substantial evidence still supports the ALJ's conclusion that Plaintiff can perform the positions of housekeeper and dishwasher.[12]  Accordingly, the Court finds that the ALJ properly relied on the VE's testimony in

[12] The Ninth Circuit Court in *Zavalin* addressed an apparent conflict between an assessed RFC of simple, repetitive work and Level 3 reasoning.  778 F.3d at 847. Therefore, that case is not factually analogous to this case.

concluding Plaintiff can perform other work.

Accordingly,

**IT IS ORDERED** that the Commissioner's decision is affirmed.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly and terminate this case.

Dated this 29th day of September, 2016.

Honorable John Z. Boyle
United States Magistrate Judge